■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JAMES ALBERT, Also Known as JAMES ALBERT, JR., Appellant. [615 NYS2d 10] —Judgment, Supreme Court, Bronx County (Frank Diaz, J.), rendered April 29, 1992, convicting defendant, after a jury trial, of robbery in the first degree and criminal possession of a weapon in the third degree, and sentencing him, as a persistent violent felony offender, to two concurrent indeterminate terms of 10 years to life and 6 years to life, respectively, affirmed.

On November 14, 1990, shortly before 1:00 A.M., Sean Escourse was confronted on 183rd Street in the Bronx by defendant-appellant James Albert, who was wearing a white jacket, and his co-defendant Stewart Jackson, who was wearing a black jacket. Albert pointed a shiny silver gun at Escourse's head and demanded his money, while Jackson reached into Escourse's pockets and removed his wallet and money, which included 39 single-dollar bills. Albert and Jackson then fled.

Several minutes later Police Officer Thomas Fitzgerald and Sergeant Robert Rauhofer, while on motor patrol, observed Albert, wearing a white jacket, and Jackson, wearing a black jacket, running down 183rd Street toward them, and looking over their shoulders as they ran. The officers asked Albert and Jackson why they were running, and both men responded "we've just been robbed." As the officers stopped their patrol car and got out to investigate, Albert removed a silver gun from his jacket and threw it under a parked car. Both men were immediately restrained by the officers. Thirty-eight single-dollar bills were later found in Jackson's possession.

As this was taking place, Mr. Escourse flagged down another police car, and reported to Police Officers Luis Aponte and Brian Martin that he had been robbed at gunpoint just two minutes earlier. After receiving a description of the robbers, Officer Aponte transmitted an alarm for two black

males, wearing white and black jackets, one of whom was carrying a weapon. Officer Fitzgerald and Sergeant Rauhofer received this transmission moments after having restrained Albert and Jackson, and Sergeant Rauhofer then radioed Officer Aponte to come to his location half a block away. Within five minutes of the robbery Mr. Escourse arrived and identified Albert and Jackson as his assailants.

After the jury had been deliberating for approximately 4½ hours, the foreperson sent a note to the court which read: "We the members of the jury will *never* be able to reach a verdict due to the fact that information pertaining to this case was overheard outside of the courtroom by a juror and was repeated in the presence of all the jurors." Albert's counsel moved for a mistrial, but "failing that," requested that the court determine, in writing, which juror had conveyed the information to the rest of the jurors. A written inquiry was then made by the court as to the identity of the juror. The jury responded that it was juror number 9, Ms. Barnes, who was then brought into the courtroom and asked what she had heard. Ms. Barnes replied: "One day I was leaving the jury room, seeing another juror, and we got on that elevator with these two individuals, and they was laughing and joking. Then I heard one say, 'Wait until we get Shawn.' And so when we was deliberating, you know, it was the statement I made in there." Further inquiry by the court revealed that one of the two individuals in the elevator was Officer Aponte. Albert's counsel then told the court that "I am going to oppose any mistrial because I believe jeopardy has attached. And this is through the interference of the District Attorney's own witnesses in this case, Judge. And I am going to be opposing any mistrial. If one is granted, it is over my objection." Counsel for Jackson and the Assistant District Attorney concurred in the position taken by Albert's counsel.

The jury was instructed "to decide this case only on the evidence presented in open court and nothing else, absolutely nothing else." The court asked the jurors individually whether they could follow that instruction and 10, including Ms. Barnes, immediately said they could. Two jurors responded that they were unsure, but after being reminded of their duty to decide the case only on the evidence presented, those jurors also agreed to do so. The court then sent the jury back to continue deliberations without objection by either counsel.

Forty-five minutes later, the jury sent out a note requesting "in layman's terms" the elements of robbery in the first degree, robbery in the second degree and criminal possession

of a weapon in the third degree. Albert's counsel at that point renewed his motion for a mistrial and moved also for dismissal of the indictment "based upon the statement of juror number 9 to the other eleven deliberating jurors, based upon the fact that we have an agent of the State, Police Officer Aponte deliberately interfering with Mr. Albert's right to have his case decided by the jury that he picked free from taint." We observe, however, that Ms. Barnes never stated that Officer Aponte said "Wait until we get Shawn." It may have been the other individual who said that to Officer Aponte. There also is nothing in the record to indicate that it was said deliberately by either of the two individuals to taint the jury. Counsel also assumed that "Shawn" (or "Sean") referred to the complainant Sean Escourse.

In any event, even if all of the above were to be assumed, Albert's appellate counsel concedes that "there was absolutely no reason that Officer Aponte would want to threaten the complainant, the People's key witness." This view is in accord with the Trial Judge's comment during colloquy respecting this alleged incident, that "I fail to see the prejudice to the defendants because it appears to me that the allegation is that somehow or other Officer Aponte wants to get in a threatening manner his own complaining witness. And that makes no sense."

Albert's conviction must be affirmed. When defense counsel is present and given notice of the court's determination of how to respond to a juror's inquiry, traditional preservation rules are applied *(People v DeRosario,* 81 NY2d 801, 803). Since defense counsel never objected to the Trial Judge's inquiries of Ms. Barnes or of the other jurors, or requested that further inquiries be conducted, any claims of inadequacy of the court's responses are now waived and will not be reviewed by this Court (CPL 470.05 [2]; *People v Almodovar,* 196 AD2d 718, *lv denied* 82 NY2d 890, *cert denied* — US —, 128 L Ed 2d 871; *People v Hentley,* 155 AD2d 392, *lv denied* 75 NY2d 919).

Further, although defense counsel at one point requested a mistrial when the issue arose, he firmly and unequivocally opposed a mistrial once he became aware of the substance of Ms. Barnes' disclosure, and did not object when the court delivered curative instructions and sent the jury back to deliberate; thus Albert has not preserved for appellate review any claim regarding the court's actions or prejudice resulting from Ms. Barnes' disclosure *(People v Igartua,* 171 AD2d 547, *lv denied* 78 NY2d 923; *People v Cortes,* 173 AD2d 319, *lv denied* 78 NY2d 1075; *People v Noel,* 156 AD2d 592). Also, by

opposing any mistrial motion and going along with the court's handling of the issue until it became apparent that the jury was no longer troubled by Ms. Barnes' disclosure and was proceeding to verdict, counsel will be deemed to have invited any purported error (assuming, arguendo, that there was error in the court's handling of the incident) and cannot now complain on appeal *(People v White,* 53 NY2d 721, 723; *People v Aezah,* 191 AD2d 312, *lv denied* 81 NY2d 1010). When defense counsel renewed his motion for a mistrial the Trial Court aptly noted: "You cannot have it both ways. You cannot tell me at one point, Judge, I'm withdrawing my motion for a mistrial, then I bring the jury out, do what I have to do, and then the jury sends me a note indicating that they are deliberating, and all of a sudden renew your application on facts that are no longer before us." To condone this method of litigation would be tantamount to allowing appellant's "eating his cake and having it too. This we will not do." *(People v Tarsia,* 50 NY2d 1, 9.)

Even if we were to examine the issue in the interest of justice, we would find no reversible error. "[N]ot every misstep by a juror rises to the inherently prejudicial level at which reversal is required automatically. Because juror misconduct can take many forms, no ironclad rule of decision is possible. In each case the facts must be examined to determine the nature of the material placed before the jury and the likelihood that prejudice would be engendered." *(People v Brown,* 48 NY2d 388, 394.) We have examined the alleged conversation overheard in the courthouse elevator which juror Barnes related to the other jurors, and find no likelihood that Albert was prejudiced thereby. The trial court's determination on a question respecting a jury's impartiality or bias is entitled to great weight *(People v Olin,* 186 AD2d 74), and we would find no basis for questioning the correctness of that determination or the adequacy of the trial court's response in this case. Concur—Carro, Ellerin and Nardelli, JJ.

Murphy, P. J., dissents in a memorandum as follows: I would reverse and remand for a new trial. Criminal Term should have declared a mistrial after receiving a written note from the jury stating: "We the members of the jury will *never* be able to reach a verdict due to the fact that information pertaining to this case was overheard outside of the courtroom by a juror and was repeated in the presence of all the jurors" (emphasis in the original).

While the facts concerning the communication are far from clear, it is nonetheless apparent that juror number 9 reported

overhearing a conversation in a courthouse elevator in which someone allegedly spoke about a reprisal against the complaining witness: "Wait until we get Shawn [Escourse]." Whatever the import of this alleged statement, its effect on the jury, as evidenced by the note, was substantial and was not cured by the subsequent proceedings.

The fact that defense counsel initially declined to seek a mistrial out of some apparently perceived advantage and then later moved for a mistrial is inconsequential. The note from the jury created a manifest need for a mistrial, and the curative effort of the Criminal Term was insufficient.

When the court inquired of individual jurors whether each could follow the court's instructions and decide the case only on the evidence heard in open court, one juror repeated, "I have difficulty," and another said "I'll try." The subsequent examination of those two jurors, in which the court essentially persuaded them to agree, is wholly insufficient.

Appellant was deprived of a fair trial by the outside communication (see, People v Dashnau, 187 AD2d 966, lv denied 81 NY2d 838; People v Thomas, 184 AD2d 1069, lv denied 80 NY2d 934). Is there any doubt that if a mistrial had been declared over the defendant's objection and defendant had subsequently petitioned for a writ of prohibition barring reprosecution of the indictment on double jeopardy grounds, that this Court, upon the present record would hold that the mistrial was manifestly necessary and on that basis deny the writ? Indeed, unless the writ would be sustained and the indictment dismissed, it would seem that there is no alternative to recognizing what is, in any case, manifest, namely, that the termination of this trial after the disclosure of the juror misconduct and its evident effect upon the jury's capacity to reach a fair verdict, rendered the termination of the defendant's trial manifestly necessary. It follows ineluctably that the defendant's mistrial motion ought to have been granted and that a reversal of his conviction is now required.