[781 NYS2d 75]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v THOMAS KELLY, Appellant.

First Department, August 19, 2004

## APPEARANCES OF COUNSEL

*Robert S. Dean, Center for Appellate Litigation,* New York City (*Abigail Everett* of counsel), for appellant.

*Thomas Kelly,* appellant pro se.

*Robert M. Morgenthau, District Attorney,* New York City (*Eleanor J. Ostrow* and *Hilary Hassler* of counsel), for respondent.

## OPINION OF THE COURT

SULLIVAN, J.

On appeal from his conviction of murder in the second degree, defendant cites as the basis for reversal, inter alia, the impropriety of a court officer's jury room demonstration, undertaken at the jury's request, of pulling a bayonet, the murder weapon, from its sheath. The issue is presented both on the direct appeal from the judgment of conviction and on the consolidated appeal, by leave of a Justice of this Court, from the denial, after an evidentiary hearing, of defendant's motion to vacate the judgment pursuant to CPL 440.10.

Dawn Kaye, 29 years of age at the time of trial and a drug user since she was 11 years old, testified that in July 1997 she ended her relationship with defendant, with whom she had lived since 1993, and moved in with her father, William Hageman, a superintendent of an apartment building at 201 East 12th Street in Manhattan. During the week after Kaye left him, defendant concocted various excuses to call and contact her, but she spurned his reconciliation attempts. That same month, Kaye began working as a prostitute. Despite her participation in a methadone program, she still used cocaine, virtually daily, and heroin, occasionally.

On July 29, 1997, defendant telephoned Kaye's father, asking for Kaye. Knowing that she did not want to talk to him, Hageman told defendant that Kaye was not at home. At about 10:30 P.M., as Kaye and her father were leaving the building, defendant approached them, telling Kaye that she had "better talk to [me]." Defendant and Kaye stepped away from Hageman. Kaye

reaffirmed that she wanted nothing to do with defendant. In response defendant, alluding to Kaye's involvement in prostitution, told her that he was going to tell her father what she was doing for a living, to which Kaye answered, "[G]o ahead."

Defendant walked over to Hageman, leaning with his back against the front entryway to the building, and asked, "[D]o you know why we broke up?" Answering his own question, defendant continued, "Well, she's working the street." Refusing to take the bait, Hageman responded that he "didn't care," and that defendant should leave Kaye and her family alone. Like a child having a "temper tantrum," according to Kaye, defendant began "stomping around." After warning defendant, "You're not going to do anything out here in front of people," Hageman directed Kaye to call the police.

As Kaye was about to enter the building, she saw defendant make a sudden move. "[I]t looked like [defendant] grabbed her father or pushed him or something." Kaye saw one of defendant's hands on Hageman's shoulder and the other near Hageman's chest, as he leaned toward Hageman. At that particular time, Kaye could not see anything in defendant's hands; but, when she stepped back from the door, she saw a bayonet in his hand. The bayonet was "coming out of [her] father's chest." Hageman then reached behind him, toward a small work knife that he regularly carried in a sheath on his belt, and then fell to the ground. Defiantly, according to Kaye, defendant announced, "There, now, I killed your father." Defendant then walked away, ultimately breaking into a run as he headed down the street.

A host of other witnesses, from various locations on the street, saw defendant arguing with Hageman and physically assaulting him. Robert Gengerki, walking home, heard a loud argument and saw defendant, standing with Hageman and Kaye across the street in front of a building. Defendant was shouting and Hageman told him to "get out of here." Gengerki next saw defendant lift up his hands and push Hageman by the shoulders against the door of the building. Hageman, standing with his hands at his side, stumbled back against the door. Hageman straightened up, pointed to Kaye and told her to call the police. As Kaye turned toward the door, Gengerki saw her fumble with her key and look back toward her father and defendant. Gengerki then saw a knife, about nine inches long, which defendant held at the center of Hageman's chest. Defendant raised the knife upward, turned abruptly and walked away. Hageman fell to the ground, bleeding profusely. Five other witnesses confirmed Gengerki's account of the incident.

On the night in question, Moses Pardellas was walking west on East 12th Street toward Third Avenue, when he saw a man, later identified as defendant, crouched down on the ground on one knee, wiping a knife with a piece of paper. Defendant looked at Pardellas and then quickly moved the knife to his side and ran down the street, disappearing onto Second Avenue.

Pardellas continued walking toward Third Avenue and saw Hageman on the ground, bleeding and choking on blood. Kaye, on her knees next to him, was screaming, "[M]y dad, my dad, my dad got stabbed." Asked by Pardellas if the perpetrator had long hair and had fled with the knife toward Second Avenue, Kaye said, "[Y]eah. That bastard, my ex-boyfriend, he stabbed my father."

At about 10:35 P.M. Police Officer Calabro, responding to a radio run of a stabbing on East 12th Street, which included a description of the perpetrator, saw a man fitting that description walking southbound on Avenue A near 10th Street. Calabro drew his gun, identified himself as a police officer, and said, "Don't move." The man, with blood on his shirt and hands, put up his arms and said, "I did it, you got me, I'm the one you're looking for." Shortly thereafter, a detective took Kaye and Pardellas to that location, where Kaye identified the person being held as her boyfriend, the man who stabbed her father, and Pardellas identified him as the man he had seen wiping a knife on East 12th Street.

Meanwhile, Hageman was taken by ambulance to Beth Israel Hospital, where he was pronounced dead. When Hageman was lifted from the ground at the scene, a knife belonging to him was recovered from underneath where he had been lying. In searching the crime scene and vicinity around it for evidence, the police found a cardboard sheath, wrapped in black electrical tape, on the ground down the block from Hageman's building, as well as a discarded, blood-stained menu, which Pardellas recognized as the piece of paper defendant had used to wipe the blade of the bayonet. An officer retrieved the bayonet, 12 inches in length and with blood on it, from a sewer drain on the corner of Second Avenue and 13th Street. A lineup was conducted the next day, July 30, 1997, at which two of the five witnesses viewing it identified defendant. An autopsy conducted that same day revealed a stab wound to Hageman's chest $2^{1}/_{2}$ inches deep that penetrated the right ventricle of his heart, causing his death.

Defendant testified on his own behalf. A carpenter, he became addicted to heroin in 1992, after sustaining a back injury that

caused him excruciating pain. That same year, Kaye moved into his apartment. In 1993 defendant, concerned about Kaye's safety when she was alone in the apartment, at her suggestion, purchased a bayonet from a friend who collected military memorabilia. Sometime in 1997, defendant had overcome his heroin addiction and began bickering with Kaye about her heroin habit. In July of 1997, he suddenly noticed that Kaye had money to spend and eventually, on or about July 22, confronted her, accusing her of engaging in prostitution. He pleaded with her that "this can't go on." Kaye's response was to leave him.

When defendant learned that Kaye was now living with her father, he became concerned because she had told him years before that her father had sexually molested her. On July 29, looking for any excuse to contact Kaye, he decided to return the bayonet to her after accidentally finding it. He put the bayonet in the sheath and tucked the sheath into his waistband, covering both objects with his shirt. He called Kaye at her father's apartment and spoke to her father. When Hageman hung up, defendant waited near the front entrance to the building.

Defendant saw Kaye and her father, whom he had met only once, emerge from the building. Defendant walked up to the two and introduced himself to the father, who refused to offer his hand in return, saying, "I know who you are." When defendant said that he wanted to talk to Kaye, Hageman told him that she was afraid of him. Defendant pleaded to talk to Kaye, who interjected and said that she would speak to him. After telling Kaye that he loved her, defendant, referring to her prostitution, asked why she was "doing this." When defendant threatened to tell her father about her prostitution, Kaye responded, "Go ahead." Defendant then asked Hageman if he knew what his daughter was doing for a living and, answering his own question, added, "She's hooking." When Hageman did not answer and defendant asked, "[D]id you hear me[?]," Hageman said that he did not "care what [defendant] ha[d] to say" about her. When defendant challenged Hageman about his lack of concern that his daughter was "hooking so she can buy her drugs," Hageman told defendant that he didn't care about "what you've got to say about me or anybody in my family."

By then, the two men were yelling at each other and defendant told Hageman, "[S]ince you're into child molesting, . . . this is okay too." Hageman told defendant to leave and threatened him; defendant responded in kind, to which Hageman replied, "You're not going to do anything." Defendant said,

"[Y]ou're right" but insisted that he did not have to leave. Hageman told Kaye to call "911."

Deciding that it would be better if he left, defendant, standing two feet away from Hageman, lifted his shirt revealing the bayonet and sheath, which he intended to return to Kaye. He tilted the bayonet and sheath forward to remove it from his waistband and, as he did so, said to Hageman, "[Y]ou know, this belongs to Dawn and she is going to need this living with you." As Hageman grabbed the handle of the bayonet, defendant tried to stop him from drawing it, slicing his thumb in the process. Feeling the pinch, defendant stepped back. Hageman got control of the bayonet and pointed it at defendant, who, using both hands, grabbed Hageman's right hand, which held the bayonet and "pushed" his wrist so that the bayonet faced Hageman. Defendant immediately released his grip on the knife.

Events happened so quickly that defendant did not know that the bayonet had even touched Hageman's chest until he saw blood on Hageman's shirt. Exclaiming "Oh my God," defendant told Kaye, "I just killed your father." Defendant ran for a few steps and then began to walk away. He picked up a discarded menu and tried to stem the bleeding from his thumb. While wiping his thumb he saw a man, Pardellas, walking and tried to hide the knife. He started walking again and, when he heard sirens, discarded the knife in a sewer drain. A police officer approached him and directed him to "freeze." Defendant raised his hands and said, "Take it easy. I'm the one you're looking for."

The parties, at the start of deliberations, had consented to allow the trial exhibits to be given to the jurors whenever they requested them. On the third day of deliberations, a court officer brought the bayonet and sheath, trial exhibits, into the jury room in response to a written jury request to see them. When the jurors sought to handle the exhibits, the court officer, concerned for their safety, refused. After some hesitation, the officer agreed to the jury's request that he remove the bayonet from the sheath so that they could observe. The officer then answered a few questions from the jurors about the demonstration and, promptly afterward, notified the judge of the incident. The judge, in turn, advised counsel. Both parties agreed with the court that the appropriate response to the court officer's disclosure was to give the jury a curative instruction to disregard the officer's demonstration. The court had the jury return to the courtroom and issued the following instruction: "Any

demonstrations by court officers in the jury room, with the evidence, must be disregarded by you and must play no part whatsoever in your deliberations." The jury continued its deliberations for the rest of the day and for two days afterward, ultimately returning a guilty verdict.

After sentence, defendant moved, pursuant to CPL 440.10, to vacate the judgment based on the court officer's jury room demonstration, supporting the motion with the affidavits of two jurors, Michael Prettyman and Charles Fernandez. Prettyman alleged that "much of the jury's deliberations had to do with trying to decide if the defendant . . . had told the truth when he testified and whether [he] had intended to kill William Hageman," and to that end, he explained, "[T]o test the defendant's credibility, we tried to reenact the scenario he described." Initially, according to Prettyman, the jurors used a ruler instead of the bayonet. Eventually, however, the jurors asked to see the bayonet and sheath and a court officer brought the two exhibits into the jury room. As Prettyman explained, "We wanted to see for ourselves if the bayonet would come out of its sheath when grabbed by the handle, as the defendant had described Mr. Hageman's actions in his testimony. Some jurors thought that the sheath was so tight that both the bayonet and sheath would come out of the waistband together if grabbed by the handle."

Prettyman confirmed that the court officer would not allow the jurors to handle the bayonet and that one of the jurors asked the officer to place the bayonet and sheath in his own waistband and to pull the bayonet out by the handle. The officer complied with the request, whereupon one of the jurors asked, "What would be the most natural way to seize the handle of a bayonet?" Prettyman stated that the officer "again demonstrated how he had pulled out the bayonet and said, 'This way.' "

The other juror, Fernandez, stated that "on more than one occasion, the jurors tried to reenact the incident, as it was described by different witnesses, including the defendant." Like Prettyman, Fernandez stated that some of the jurors, based upon their observations, believed that the bayonet fit tightly inside the sheath and theorized that, if the victim had grabbed the bayonet, the sheath would have come out of the defendant's waistband with the bayonet. The court officer had refused to allow the jurors to pull the bayonet from the sheath. Fernandez personally asked the officer to "unsheath the bayonet for us to observe." According to Fernandez, after some initial hesitation, the officer placed the bayonet in the sheath, and the sheath in

his belt and then drew the bayonet from the sheath. In response to Fernandez's question, the officer told the jury that the bayonet had come out of the sheath "easily." At Fernandez's request, the officer drew it again from the sheath. A juror asked if the officer had military training and whether his grip on the bayonet comported with military standards. The officer responded that he had had military training and that "that was the proper way to do it." When a juror asked if the bayonet fit "tight[ly]" in the officer's belt, the officer said that it "was not too tight."

Defendant also supported his postconviction motion with an affirmation from his trial attorney, who noted that during jury deliberations, the trial court notified the parties that a court officer had participated in a demonstration with the bayonet and sheath in the jury room: "We were told that the officer had pulled the bayonet out of the sheath for the jurors to watch and had answered some juror questions about the demonstration." After a discussion with the defendant, his attorney "agreed that the judge should instruct the jurors to disregard the court officer's jury-room demonstration and I did not request a mistrial."

In a reply affirmation, defendant attached three letters from juror Fernandez, one written to the court and two to defendant. In his letter to the court, Fernandez stated that, subsequent to the trial, he learned "several things" that led him to conclude that the jury "convicted on the wrong charge." As he explained, defendant's "testimony was discounted because [he] had three years to get his story straight." Since the trial, however, Fernandez wrote, he learned that defendant had given "substantially the same account the night of his arrest and to his lawyer the following day." Fernandez asserted, "If we had know[n] this to be true, perhaps we would not have so easily dismissed the entirety of [defendant's] testimony," and might have "gotten to vote on a lesser charge."

In a letter to defendant, Fernandez explained, "I asked the bailiff to draw out the knife for two reasons. First it proved that it readily came out of the sheath easily and cleanly," a circumstance that, in Fernandez's estimation, was helpful to defendant. In his letter, Fernandez further noted: "Second, the bailiff drew the knife in his hand with his palm up and towards his body. This is the proper military procedure for drawing a knife and it contradicted the eyewitnesses who had the knife in your ha[n]d with the palm out and towards Hageman's body. My contention was that you would not have the knife in your

ha[n]d the way the eyewitnesses said you did unless you had taken the knife away from Hageman." This observation led Fernandez to conclude, "The intent and result of the demonstration gave credence to your testimony. The demonstration did that to my satisfaction but was dismissed by the majority as inconclusive. By this time the majority had made up their minds about you and this case."

In an opposing affirmation, the trial prosecutor recalled that, during jury deliberations, a court officer had informed the court that "some jurors asked [him] to place the sheathed bayonet in his belt and pull the bayonet out of its sheath." The officer had also stated that he had "answered some juror questions concerning how the knife came out of the sheath." In an affidavit submitted by the People, a supervising court officer with no involvement in the case described the general responsibilities of court officers and confirmed that deliberating jurors are not to be left alone with evidence consisting of either knives or guns. In a second affidavit, submitted by defendant, the supervising officer stated that a court officer is obliged to deny a deliberating juror's request to hold a knife or gun and, without any other conversation with the juror, to inform the juror to put the request in a written note to be given to the judge. In a third affidavit, submitted by the People, the supervisor clarified the court officer's responsibility in such situations: the court officer is to deny the request and either inform the juror to put the request in writing or promptly report the request to the court.

At an evidentiary hearing on the motion, Wayne Darden, the court officer who conducted the demonstration, testified that pursuant to a jury note, he took the bayonet and sheath into the jury room. He recalled that some jurors had asked to handle the bayonet and that he told them that they could not. Darden believed that he pulled the bayonet out of the sheath at one point. He could not, however, recall whether the jurors had asked him any questions about the demonstration. Never in the military himself, Darden did not know the correct military procedure for holding a bayonet.

In denying defendant's postconviction motion, the trial court found that after placing the sheath in his waistband and drawing out the bayonet, at the jurors' request, the court officer, in answer to their question, told the jurors that the bayonet had come out of the sheath easily. After leaving the jury room, the officer reported to the court what had happened and, in a discussion off the record, the court informed the parties both of the

officer's demonstration and his answers to the jury. After consulting with defendant, defense counsel agreed that the appropriate response was for the court to instruct the jury to disregard any demonstration by a court officer. The court delivered such an instruction, "the wording of which satisfied both sides," and the jury resumed its deliberations, returning a verdict two days later. On such a record, the court found, defendant "waived any issue with regard to the demonstration itself," rejecting defendant's argument that the error was one that did not have to be preserved for review.

On appeal of both the judgment and order, defendant, in arguing for a new trial, claims that the court officer's refusal to allow the jurors to handle the bayonet and failure to tell them to put their request to handle it in a note to the court constituted a usurpation of a judicial function or delegation thereof, an error so serious that it cannot be waived without a waiver, in writing, signed personally by him, and one that is not subject to harmless error analysis. Defendant argues further that the court officer compounded this fundamental error by conducting a demonstration and answering questions, thus becoming an unsworn trial witness. He also argues that the court officer's conduct violated his right to be present at a material stage of the trial, another fundamental error.

It hardly bears repeating that a court's delegation of a judicial responsibility to nonjudicial personnel deprives a defendant of his "right to a trial by jury, an integral component of which is the supervision of a judge," and constitutes an error so fundamental that, even without preservation, it presents a question of law subject to appellate review (*People v Ahmed*, 66 NY2d 307, 310 [1985]). This right cannot be waived except by written instrument, executed by the defendant in the court's presence and with its approval (*id.* at 311).

The failure of a judge to retain control over jury deliberations is different from ordinary error. Because of its impact on the constitutional right to a trial by jury, it implicates the organization of the court and the prescribed mode of proceedings (*id.*). In *Ahmed*, the trial judge, due to sickness, absented himself and, with the defendant's consent, delegated some of his duties to his law secretary during a part of jury deliberations. The Court held that a question of law was presented even without a timely objection (*id.*).

Similarly, the right of a defendant to be present at the material stages of a trial, such as the court's response to a jury in-

quiry, is rooted in both constitutional principles and statute (US Const 6th Amend; NY Const, art I, § 6; CPL 310.30 [jury must be returned to courtroom and defendant's presence required when court responds to jury request for instruction or information]; *People v Ciaccio*, 47 NY2d 431 [1979]). Thus, a violation of a defendant's right to be present for a court's response to a jury inquiry presents an issue of law even in the absence of objection (*People v Mehmedi*, 69 NY2d 759, 760 [1987]). Harmless error analysis is not available for such a violation (*id.*).

The right to be present at a material stage of a trial can, however, be knowingly and voluntarily waived (*People v Velez*, 304 AD2d 391 [2003]; *People v Van*, 161 AD2d 326 [1990], *lv denied* 76 NY2d 867 [1990]). Waiver and preservation are separate concepts (*People v Iannone*, 45 NY2d 589, 600 [1978]). A waiver can be conveyed by defendant's counsel (*People v Brown*, 256 AD2d 92 [1998], *lv denied* 93 NY2d 967 [1999]); "[m]erely because a waiver is expressed by counsel does not render it unknowing if the record demonstrates that the defendant was made aware of his rights" (*People v Santana*, 247 AD2d 201 [1998], *lv denied* 91 NY2d 977 [1998]).

On appeal, defendant argues that the court officer's refusal to allow the jurors to remove the bayonet from the sheath "exceeded the officer's ministerial function and usurped the court's obligation to decide whether the jury could undertake such an examination of the exhibits." In this regard, defendant also argues that his right to be present during a material stage of the trial was violated because he was not present when the officer refused the jury's request to handle the bayonet. In attempting to transform the officer's refusal into a usurpation of a judicial act, defendant stresses the fact that the court never informed the jurors that they could make their request directly to the court.

These arguments are meritless. The officer's refusal to allow the jurors to handle the bayonet constituted neither a delegation nor usurpation of judicial authority. A delegation of judicial authority is a conscious abdication of judicial responsibility. In the instant matter, the court, which had no inkling of the jury's request to handle the bayonet until after the officer returned from the jury room, never told the officer how to respond to the jury's request. Moreover, the court officer's refusal to relinquish control of the bayonet was purely ministerial, not a usurped judicial act. As recognized by case law (*see People v Gomez*, 273 AD2d 160 [2000], *lv denied* 95 NY2d 890 [2000]) and attested to

by court officers in this case, one of a court officer's duties is to safeguard jurors. No one can gainsay that a bayonet is an inherently dangerous instrument, which, quite appropriately, the court officer refused to hand over to the jurors. His communication of that refusal did not convey any legal instruction or impart any information to the jurors about the trial evidence (*see People v Van, supra* [clerk's communication, in defendant's absence, to deliberating jury that a requested report was not in evidence did not affect substantial right and was not so material as to require reversal]). Rather, in refusing the request, the officer was merely fulfilling his ministerial duty of safeguarding the jury.

To the extent that defendant's real quarrel with the court officer's response to the jury's request was his failure to instruct the jurors to put their request in writing, any lapse in that regard was also ministerial, since a direction to the jurors to put their request in writing would have been ministerial in nature. If a court officer's failure to perform a ministerial duty amounts to trial error, it cannot be an error affecting the mode of proceedings so as to exempt it from ordinary preservation and waiver rules, requiring reversal even in the absence of prejudice to the defendant. It should be noted that even the court's failure to give a deliberating jury a pertinent instruction does not constitute error so fundamental as to exempt it from preservation and waiver rules (*People v Bonaparte*, 78 NY2d 26, 31, 31 n [1991]) or harmless error analysis (*People v Smith*, 181 AD2d 844 [1992], *lv denied* 80 NY2d 977 [1992]).

*Bonaparte* illustrates the point. There, the court directed a court officer to inform the deliberating jury that it was going to be sequestered; the jury was thereafter sequestered without an instruction not to discuss the case among themselves or with anyone else. Although aware that the case would be adjourned without such an instruction, defense counsel did not object. The following day, defense counsel, belatedly, did register an objection. On appeal, the Court of Appeals, noting its disapproval of the procedure, concluded, nonetheless, that the officer's communication was purely ministerial and that the court's failure to give the appropriate instruction was an omission that, in the absence of a protest, did not present an issue of law for the Court's review. Clearly, a court officer's failure to give a ministerial direction to the jury is not exempt from the requirement of preservation.

In any event, as subsequent developments show, the court officer's prompt notification of the jurors' request and his demon-

stration and answers to the jurors' questions had the same effect as if the court officer had asked the jurors to put their request in writing. The court promptly informed the attorneys of the officer's notification. As the court found in ruling on the postjudgment motion, the disclosure was sufficient to put the court and the parties on notice that the jury had asked for a demonstration with the bayonet and sheath, thereby accomplishing the same result that a jury note would have achieved. So informed, the court and the parties had the opportunity to address the jury's interest in such a demonstration. Had anyone expressed that it be done, the court could have directed a written request from the jury as to the bayonet and sheath. Instead, the court and parties settled on another way to address the court officer's encounter with the jury—an instruction to the jury to disregard the demonstration. Thus, contrary to defendant's argument that the court officer had the "final say" on the jurors' request, and unlike the situation in *People v Khalek* (91 NY2d 838 [1997] [court officer's supervision usurped judicial function when, without attempting to contact the court, he informed jurors who had reached a verdict that they would not be permitted to deliver it until the next morning, by which time they had changed their minds]), *People v Flores* (282 AD2d 688 [2001] [in response to jury request for translation of letter, court officer, without informing the court, let jurors believe that one of their members could translate letter]), and *People v Nichols* (163 AD2d 904 [1990] [court officer, at clerk's direction, without court's knowledge told jury it could not have readback of testimony as requested]), it was the court and the parties who had the final say on the matter.

Defendant's claim that his right to be present at a material stage of the trial was violated by his absence when the court officer refused to turn over the bayonet and sheath to the jurors in the jury room was similarly waived by his agreement that a curative instruction would remedy any error resulting from the officer's jury room demonstration (*People v Van, supra*). Waiver aside, however, defendant had no right to be present when the officer refused to allow the jurors to have possession of the bayonet and sheath. A defendant has no right to be present during jury deliberations; nor does he have a right to be present when a court officer performs a ministerial task during deliberations (*People v Bonaparte, supra* at 30-31).

Similarly, the court officer's jury room demonstration with the bayonet and sheath, typically the kind of experiment that a

jury could conduct itself in the jury room, and his answers to the jurors' questions about the demonstration did not constitute a mode of proceeding error or a violation of defendant's right to be present. Errors of this type are subject to preservation and harmless error analysis.

It is well recognized that jurors may conduct a jury room crime reenactment or demonstration provided it involves no more than the "jurors' application of everyday experiences, perceptions and common sense" to the evidence (*People v Gomez*, 273 AD2d 160, 161 [2000], *lv denied* 95 NY2d 890 [2000] [jury properly permitted to "drop" gun, a trial exhibit, to jury room floor, where "sound the weapon would make when dropped" was a trial issue]; *see also People v Maragh*, 94 NY2d 569, 574 [2000]). Conversely, demonstrations that entail more than the application of everyday perceptions and common sense are prohibited (*People v Stanley*, 87 NY2d 1000, 1001 [1996] [jurors' "experiment" during official crime scene visit exceeding scope and manner of consent to demonstration and "pointedly aimed at authenticating the eyewitness's version of the crime" improper]; *People v Brown*, 48 NY2d 388 [1979] [experiment conducted by one or more jurors outside jury room, results of which later shared with others jurors, found improper]). In the latter instances, the reenactments turned the jurors conducting the experiments into unsworn witnesses, thereby introducing nonrecord facts into the jurors' deliberations. Extrarecord information may, of course, be improperly introduced into jury deliberations by means other than a juror's unauthorized experiment (*see e.g. Parker v Gladden*, 385 US 363 [1966]).

Whatever the manner by which extrarecord material finds its way into the jury's deliberations, the defendant who learns during the trial of the jury's exposure to such material must promptly record his protest and request the remedy he deems appropriate. What he cannot do is acquiesce in or consent to one remedy at trial and then on appeal argue for another remedy. In *People v Albert* (206 AD2d 320 [1994], *affd* 85 NY2d 851 [1995]), a juror overheard two persons, one a police witness, in a conversation in which a reference to the complaining witnesses was made. The juror repeated this conversation to the other jurors. When this incident was brought to the court's attention during deliberations, defense counsel opposed any mistrial. The court instructed the jury to "decide this case only on the evidence presented in open court and nothing else" (*id.* at

321) and, after receiving affirmative answers to its question asked of the jurors individually as to whether they could follow the instruction, the court, without objection from either side, directed the jury to continue its deliberations. Applying traditional preservation rules, this Court held that any claim as to the trial court's actions or prejudice resulting from the juror's disclosure was unpreserved for appellate review.

Of course, to justify a new trial, the jury's exposure to extra-record material during deliberations, as with any outside influence on the jury process, requires a showing of the likelihood of prejudice (*see People v Brown, supra* at 394 [where jury in possession of evidence not offered at trial, "the facts must be examined to determine the nature of the material placed before the jury and the likelihood that prejudice would be engendered"]; CPL 330.30).

Here, defense counsel never argued before the trial court that defendant was entitled to a new trial on the basis of the jury room demonstration. Instead, after consulting with defendant, defense counsel consented to the court's giving a curative instruction as the remedy for any error in connection with that demonstration. Thus, as we held in *People v Albert* (*supra*), by not asking for a mistrial when he learned of the demonstration, defendant failed to preserve his claim of entitlement to a new trial. Moreover, in agreeing to the court's curative instruction to the jury to disregard the demonstration, he waived his right to any other relief (*id.* at 322-323).

Waiver and lack of preservation aside, defendant fails to show any prejudice as a result of the demonstration. Were it not for the danger posed in handling the bayonet, the jurors themselves could have pulled the bayonet from the sheath as part of their own test as to how tightly the sheath fit the bayonet. It was they who suggested the demonstration in the first instance. And, as the record reflects, the court officer's demonstration was nothing more than the application of common sense and ordinary perception to the facts as adduced. The conclusion expressed by the officer to the jurors that the bayonet could be easily drawn from the sheath was no different from what the jurors would have concluded had they conducted the test themselves. Thus, they learned nothing new and different from what they would have learned had they conducted the test. Nor did the demonstration harm defendant. As the juror Fernandez noted, if anything, it supported his position that Hageman could have easily removed the bayonet from the sheath, as defendant

testified. In any event, the jury is presumed to have followed the trial court's instruction (*People v Davis*, 58 NY2d 1102, 1104 [1983]) to disregard the demonstration.

In point of fact though, as both jurors concede in their affidavits submitted by defendant in support of his postjudgment motion, the demonstration was not a factor in the jury's verdict. Fernandez's letters also confirm that fact. One of three or four jurors, who, according to his letter, were somewhat hesitant to convict, even Fernandez did not believe that defendant should be acquitted. On learning a fact dehors the record—that defendant had given "substantially the same account the night of his arrest and to his lawyer the following day"—Fernandez only questioned whether defendant should be convicted of a lesser crime than murder. But, in the end, as Fernandez explained in one of his letters, defendant was convicted by what he said to Kaye after the stabbing and by what he said to the arresting officer and by hiding the knife and claiming he did so "to protect the kids of 12th Street." As seems clear from the letters, the jury convicted defendant of murder based on the trial evidence and the demonstration played no part in the verdict.

Any claim that the jury room demonstration violated defendant's right to be present at a material stage of the trial was waived by his consent to the court's curative instruction as an appropriate remedy for any impropriety arising from the demonstration. His claim ignores the substance of that instruction, which, if followed, as presumed (*People v Davis, supra*), makes the demonstration a nullity. But, beyond that, a defendant does not have a right to be present at jury deliberations. Nor does the injection of extrarecord material into jury deliberations convert those deliberations into a trial stage at which defendant must be present. As noted, if the demonstration constituted error, it was an error of the type that must be preserved and would warrant relief only if the defendant suffered harm therefrom.

We have examined defendant's other contentions and find that they are without merit.

Accordingly, the judgment of the Supreme Court, New York County (Bruce Allen, J.), rendered August 7, 2000, convicting defendant, after a jury trial, of murder in the second degree, and sentencing him to an indeterminate term of imprisonment of from 22 years to life, and order, same court and Justice,

entered on or about October 16, 2002, denying defendant's motion to vacate his conviction pursuant to CPL 440.10 (l) (h), should be affirmed.

NARDELLI, J.P., ANDRIAS and ELLERIN, JJ., concur.

Judgment, Supreme Court, New York County, rendered August 7, 2000, and order, same court, entered on or about October 16, 2002, affirmed.